IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>4D CIRCLE LLC a/k/a ENOETICS,<br>MANTFORD C. HAWKINS, and<br>DAVID E. BELL<br><br>Defendants. | § § § § § § § § § § § § § Civil Action No. _____<br><br>4-17CV- 321Y |

# COMPLAINT

Plaintiff Securities and Exchange Commission ("SEC") alleges as follows:

## SUMMARY

1.      The SEC brings this action to stop a multi-million-dollar fraud scheme. Defendant 4D Circle LLC (a/k/a Enoetics, LLC), including a number of subsidiary companies, is the vehicle for the fraud scheme. The scheme has been carried out at the direction of Defendants Mantford Hawkins and David Bell—who function as 4D Circle's Chief Executive Officer ("CEO") and Chief Operating Officer ("COO"), respectively.

2.      The Defendants have attracted investor victims by claiming that they will be investing in high-return, low-risk securities investments. For example, on the front page of its website, 4D Circle describes itself as "a lower risk, higher return real estate investment." The website also claims to provide "greater profitability, less risk for our investors."

3.      Documents drafted and distributed by the Defendants reiterate these claims. For example, these materials state that: (1) investors can earn returns of 30% within a 9-month time frame; (2) the investments are "bonded"; (3) investor funds are protected through the use of

escrow accounts and third-party oversight; (4) the 4D Circle "model mitigates risk and provides higher yields in shorter terms"; and/or (5) "**Bottom Line: Enoetics performance is guaranteed**" (emphasis in original).

4. 4D Circle's securities proved neither safe nor profitable. The properties did not produce stable cash flows, but rather consistently lost cash. And no bond actually insured the investments. As a result of these and other issues, 4D Circle has ceased making interest payments to investors. To conceal 4D Circle's financial woes, the Defendants misapplied investor assets—both by diverting funds from their intended use and by using funds from new investors to pay promised returns to earlier investors.

5. From early 2014 to the date of this filing, the Defendants have fraudulently raised at least $9 million from more than 50 investors from 7 states and Canada. The Defendants also defrauded the Fort Worth Police Officers Association ("FWPOA") as part of the scheme—diverting funds earmarked for construction into the fraud scheme.

6. By engaging in the conduct alleged in this Complaint, the Defendants have committed and are committing—and unless immediately restrained and enjoined by the Court will continue to commit—intentional violations of the antifraud provisions of the federal securities laws. Thus, in the interest of protecting the public from further illegal activity, the SEC brings this action seeking all available relief—including preliminary; and permanent injunctions; disgorgement of ill-gotten gains plus prejudgment interest; and civil money penalties. In order to preserve any remaining assets for the benefit of defrauded investors, the SEC also seeks an emergency order freezing 4D Circle's assets and appointing a receiver to take control of those assets. As reflected in the unopposed motion filed in conjunction with this Complaint, the Defendants consent to the asset freeze and appointment of a receiver.

## JURISDICTION AND VENUE

7. The Court has jurisdiction over this action under Sections 20(b), 20(d) and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d) and 77v(a)]; and Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), and 78aa]. Venue is proper because a substantial part of the events and omissions giving rise to the claims occurred in the Northern District of Texas.

## PARTIES

8. Plaintiff SEC is an agency of the United States government.

9. Defendant Hawkins is a resident of Fort Worth, Texas. He is 4D Circle's CEO, its sole Manager, and its majority interest holder. He is also the registered agent and manager of a number of 4D Circle subsidiaries. These subsidiaries were created by 4D Circle to own and operate its various real estate properties. Hawkins has no professional certifications or licenses. He is not and has never been registered with the SEC in any capacity. After being served with a subpoena in the SEC's investigation, Hawkins agreed on behalf of himself and 4D Circle to an asset freeze and the appointment of a receiver over 4D Circle. He also agreed to the entry of a preliminary injunction prohibiting him from violating the antifraud provisions of the federal securities laws pending the resolution of this litigation.

10. Defendant Bell is a resident of Fort Worth, Texas. He is 4D Circle's COO and holds a minority interest in the company. Along with Hawkins, Bell controls the day-to-day operations of 4D Circle. He has no professional certifications or licenses. He is not and has never been registered with the SEC in any capacity. After being served with a subpoena in the SEC's investigation, Bell agreed to the entry of a preliminary injunction prohibiting him from violating the antifraud provisions of the federal securities laws pending the resolution of this

litigation.

11. Defendant 4D Circle, originally called Enoetics LLC, is a Texas Limited Liability Company headquartered in Fort Worth. Hawkins owns 56.25% of the company. From at least 2014 to now, 4D Circle has claimed to acquire and improve the operations of commercial and multi-family properties—sharing the profits of its operations with its investors.

## FACTS

### I. The Defendants offered debt and equity securities.

12. 4D Circle offered or offers at least two different types of securities investments. The first type of investment is a debt security, called a Commercial Debt Agreement ("CDA"). 4D Circle began offering the CDA at least as early as 2014. The Defendants describe the CDA as a "high yielding promissory note." Over time, it has offered interest rates ranging from 10-20%. Interest accrues monthly and is paid quarterly. The CDA has a two-year term.

13. At least as early as 2016, 4D Circle also began offering securities with an equity component. Like the CDA, these investments offer periodic interest payments. However, they also give investors equity in a 4D Circle subsidiary LLC that holds the underlying property or properties. The equity component allowed investors in these securities to participate in profits from the sale or refinance of the underlying property or properties.

14. Regardless of which investment vehicle they chose, investors were told that they were investing in the same basic business model. They were told that 4D Circle would use investor funds to acquire and improve multi-family or commercial real estate properties. Typically, 90% of the funds were earmarked for acquisition with the remaining 10% used for capital expenditures (a/k/a "CAPEX").

15. Investors were told that 4D Circle only acquired stable, cash-flowing properties. They were told that 4D Circle would make these properties generate even more cash through the CAPEX investments and through 4D Circle's management expertise. These operating cash flows would then be shared with investors in the form of periodic interest payments.

16. All of these activities—selecting and acquiring the properties, improving their cash flows, sharing the cash flows with investors, etc.—were performed by the Defendants. Investors were passive participants in the investments, who gave money to the Defendants with the expectation of receiving returns based solely on the efforts of the Defendants.

**II.     The Defendants enlisted a network of 4D Circle "members" to help them recruit investors.**

17. The Defendants recruited a network of people to work with 4D Circle. They referred to these people as "members." The 4D Circle members were usually independent contractors who did some type of work for 4D Circle. They were also often also 4D Circle investors themselves.

18. Most importantly, however, the members were expected to help the Defendants bring in new investor money. The Defendants put in place "Member Expectations" memorializing this expectation. For example, the "Agreed Non-Exhaustive Expectations of Members" in place during 2015 stated that the Primary Core Activity for members was to "Sell/Capture (investor/CRE)."

19. Any member who did not perform Core tasks—primarily, bringing in new investor money—faced the threat of expulsion from 4D Circle. As stated in the Member Expectations: "Any Member that consistently fails to perform his or her Core and/or Support tasks should be expected to be removed as an equity-holding Member, and forfeit his or her

equity, pursuant to the terms of the company agreement. The Manager/CEO's [Hawkins] intent is to present any non-performing Member to a vote each six month period (January/July)."

20. Throughout the time of the scheme, this expectation was continually reinforced in periodic meetings and calls with the members. For example, in a July 15, 2015 internet-based member forum, Hawkins instructed members: "Close your mother in law, yourself, your friend, your colleagues. [. . .] Close, close, close. [. . .] Think, sell, close."

21. The Defendants also put in place a process for members to follow when recruiting investors. Members were to identify prospective investors and present them with a high-level description of the investment. They were then to pass off the prospective investor to Hawkins and/or Bell—who made a more in-depth investment pitch and were ultimately responsible for closing the investment.

### III. The Defendants attracted investors by claiming that the investments were high-return, low-risk, and socially-conscious.

22. Throughout the time of the scheme, the Defendants pitched the investments through the internet, documents, phone calls (including interstate phone calls), and in-person meetings. They also used the same means to train members on how to pitch the investments. Both in direct investor pitches and member training, the Defendants claimed that the investments were low-risk and high-return. They also emphasized that 4D Circle was a socially-conscious company—focused on environmental stewardship and improving the life of its tenants.

23. On the front page of its website—http://www.4dcircle.com—4D Circle claims:

> 4D Circle is a lower risk, higher return real estate investment that owns and operates over the long term. We link People, Business, Natural Resources and the fourth dimension of Time.
>
> We exercise precise control over infrastructure to rapidly reduce operational expenses and environmental impact. The result is 50% greater profitability, less risk for our investors and improved quality of life for our tenants.

24. These claims were reiterated both in 4D Circle offering documents given to investors and in training documents distributed to members. For instance, a high-level summary in use in or around 2015 lists the following investment attributes:

- "[e]xponential returns from exits in one fifth to one tenth traditional times"
- "Increasing stabilized cash flowing **market value** commercial real estate by 40+%" (emphasis in original)
- "High yield and short investor cycle + long term cash flow base for Enoetics"
- "Reduced risk:
    o Acquiring stabilized cash flowing vs. traditional limited distressed unknowns
    o Sustained higher cash flow [. . .]
    o Bonded financial performance"
- "**Enoetics Real Estate** investments are **bonded 12 months** or less with 20-30+% annual returns. (emphasis in original)
    o 10% bonded preferred APR paid monthly 90 days from investment escrow;
    o 10% bonded kicker at exit (expected 9-12 months through pre-planned re-fi);
    o Monthly compilations from auditors managed by the sureties;
    o Funds controlled through the sureties"

25. Another document in use from at least as early as May 2014 focuses on the safety features of the investment, including a third-party bond. This document states that this provides: "Interlocking support guaranteeing completion, product performance, contract financial performance." It summarizes: "**Bottom Line: Enoetics performance is guaranteed**" (emphasis in original).

26. The Defendants made similar claims in offering/training materials in use in or around 2016. For example, a PowerPoint presentation in use during this period states:

- 4D Circle "is a wealth creation company focused on one commercial real estate property at a time"
- 4D Circle "produces above market returns"

- "Project partnerships formed since the firm's inception have received compelling, above-market returns by the acquisition and improvement of low-risk, stable, cash-flowing properties"
- 4D Circle is capable of "unlocking the financial value hidden in standard operating expenses"
- "Our pre-acquisition underwriting criteria sets the stage for long term hold (10-year plus) stability, profitability, and risk mitigation which serves as a catalyst for total quality of life improvements for tenants and communities"

27. The Defendants claimed that they could offer these higher returns because of their proprietary system of managing the properties. This system, they said, made the properties more profitable. For instance, a Confidential Information Memorandum ("CIM") that was in used to solicit investors in or around 2016 claims that "expected results" for investors include:

- "Attractive Annual Cash Yields";
- "Significant NOI [Net Operating Income] Increase";
- "Proven Track Record";
- "Significant OPEX [Operating Expense] reduction"; and
- "Sustained Property Stability."

28. The CIM also states that 4D Circle "ONLY acquire[s] properties that are currently and have proven to be stable and performing" (emphasis in original). 4D Circle also "carefully underwrites a property's historical cash flow [. . .] in a way where existing income comfortably covers senior and/or junior debt service obligations and investor cash yields."

29.     The CIM provides case studies to back up these claims. The case studies indicate that certain 4D Circle properties have shown great financial improvement as a result of 4D Circle's management. For example:

| Property | Pre-4D OPEX (as a % of income) | Post-4D OPEX (as a % of income) | Pre-4D NOI | Post-4D NOI |
| --- | --- | --- | --- | --- |
| Stratton | 115.6% | 42.8% | -$49,218 | $196,906 |
| 4D Lancaster | 66.9% | 44.9% | $119,175 | $257,131 |

30.     The CIM claims that these dramatic reductions in operating expenses and corresponding increases in profitability are the result of 4D Circle's "predictable and repeatable method that significantly reduces operational expenses." This allows investors to receive "returns that are higher than the typical [. . . returns] found in the real estate market today, while providing the investor with a lower risk profile."

31.     In a section titled "The Results," the CIM summarizes that 4D Circle "has experienced great success executing its business model over the past three years [ . . .] completing a total of 15 acquisitions [. . . and . . .] experienc[ing] significant NOI increase in each one."

32.     As the CEO and COO of 4D Circle, Hawkins and Bell were responsible for all of the representations made in the documents described in this section. They had the final say on all representations in the documents, and were in many cases the primary source of the representations. In other cases, the representations came from 4D Circle internal documents (e.g., financial reports). Hawkins and Bell were responsible for the content and accuracy of these internal documents, as well.

33.     In addition, Hawkins and Bell regularly pitched the investments to potential investors themselves. As noted above, Hawkins and Bell were responsible for

these presentations once investors had received a high-level description of the investments from 4D Circle members. These pitches contained information that was substantially identical to that in the documents—including that the investments offered high returns and low risk, and that money would be spent only to acquire or improve properties.

### IV. 4D Circle was, in reality, a fraud scheme.

34. 4D Circle was not the successful, cash rich company that was portrayed to investors. It was, in reality, a failing business that was hemorrhaging cash—an ultimately, a fraud scheme.

35. Very early on in the offerings—if not from the very outset—it became apparent to the Defendants that 4D Circle's properties were not generating enough cash to pay the promised investor returns. In fact, as the Defendants knew, 4D Circle often did not even have enough cash to pay day-to-day expenses on the properties. These cash flow problems never abated.

36. Rather than be up-front with current and prospective investors about 4D Circle's failing model, the Defendants turned to fraudulent means to keep the business afloat. These means included the misappropriation of investor funds and the use of improper accounting. Each had the effect of covering up the fact that 4D Circle's business was failing. Ultimately, these deceptive practices prolonged the scheme.

37. Because it was not generating enough operating cash, 4D Circle regularly paid the promised interest payments to existing investors using funds from new investors. These fraudulent payments had the effect of concealing the fact that 4D Circle's business model was failing. These payments began at least as soon as early 2015 and continued until interest

payments were cut off in December 2016. These payments were made at the direction of Hawkins and Bell.

38. 4D Circle also regularly misappropriated funds—including investor funds—in order to keep the scheme afloat. As detailed above, investor funds were supposed to be used for one of two purposes: to acquire property or to make capital improvements on the property. However, due to 4D Circle's cash shortages, the Defendants routinely misappropriated investor funds—using them to fund operating expenses, payments to 4D Circle members, etc. These payments were made at the direction of Hawkins and Bell.

39. At the direction of Hawkins and Bell, 4D Circle also routinely made fraudulent intercompany transfers. The Defendants took money from wherever it was available and used it wherever it was needed—even though they had told investors that the funds would be used only for capital improvements or property acquisitions. This "rob Peter to pay Paul" approach had the effect of prolonging the scheme.

40. Finally, the Defendants utilized improper accounting as part of the scheme. Primarily at the direction of Bell—but with the knowledge of Hawkins—the Defendants systematically booked operating expenses as capital expenses. This had the effect of making the properties look more profitable they really were, since capital expenses do not appear on an income statement. This had the two key effects. First, it concealed 4D Circle's cash flow problems. Second, it allowed 4D Circle to continue to attract new investors by painting the picture of a profitable business, rather than a failing one.

## V.     The Defendants made material misrepresentations to investors.

41.     The Defendants made a number of material misrepresentations to investors as part of, or in connection with, the securities offerings. They likewise omitted to tell investors crucial information as part of, or in connection with, the securities offerings.

42.     The Defendants misrepresented that: (1) 4D Circle was a low-risk investment; (2) 4D Circle's investments were supported by strong cash flows; (3) 4D Circle's performance was bonded and guaranteed; (4) 4D Circle had a proven track record of improving the profitability of its properties; (5) 4D Circle would only use investor funds for property acquisitions or capital improvements; and (6) third parties, including auditors, were providing oversight.

43.     The Defendants knew or were reckless in not knowing that these representations were untrue or misleading. At the very least, the representations were unreasonable. As the Defendants knew, 4D Circle was bleeding cash, the properties did not have a track record of profitability, and investor funds were routinely being misappropriated. They also knew that to the extent any bond existed at all, it merely secured energy savings on certain properties—not the investments themselves. They also knew that nobody was auditing 4D Circle's financial results—but rather merely providing either consulting or compilation services. Finally, because the Defendants knew that the properties were not performing well and that the investments were not protected, they knew or were reckless in not knowing the investments were very risky.

44.     The Defendants also omitted information that rendered the representations inaccurate or misleading. For instance, they failed to tell investors that: (1) 4D Circle was generating insufficient operating cash to pay ongoing operating expenses, much less interest payments; (2) investor funds were being misappropriated for various purposes, including to make promised interest payments; (3) the Defendants were systematically booking operating

expenses as capital expenses; and (4) the Defendants were routinely executing fraudulent intercompany transfers. Had investors had this information, they would have much more clearly understood how risky the investments were and how questionable 4D Circle's stated performance was. As detailed above, they omitted this information knowingly or recklessly. At the very least, the omissions were unreasonable.

### VI. The Defendants defrauded the FWPOA as part of the scheme.

45. The Defendants defrauded the FWPOA as part of the securities fraud scheme. They did this by taking funds earmarked for construction of a new FWPOA building and diverting them into other 4D Circle entities for other purposes. This had the effect of prolonging the securities fraud scheme—and was yet another chapter in the "rob Peter to pay Paul" philosophy that characterized 4D Circle's operations.

46. In late 2014, the FWPOA and 4D Circle entered into a fixed-price contract under which 4D Circle was to build the FWPOA a new building. All FWPOA funds paid under the contract were to be used for building construction, with any residual profits going to 4D Circle.

47. Between the time the contract was signed and September 2016, the FWPOA paid 4D Circle over $1 million under the contract. The funds were not used as promised. As it turned out, the Defendants diverted significant sums of money into other 4D Circle entities as part of the overall fraud scheme. The Defendants also directly misappropriated funds—including for the purchase or refinance of a property that had nothing to do with the FWPOA.

### FIRST CLAIM

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder

48. Plaintiff SEC realleges and incorporates by reference paragraphs 1 through 47 of this Complaint as if set forth verbatim.

49. Each Defendant directly or indirectly, singly or in concert, in connection with the purchase and sale of securities, by use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, knowingly or recklessly, have: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact, or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operate or would operate as a fraud or deceit upon other persons.

50. By reason of the foregoing, the Defendants have violated and, unless enjoined, will again violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

## SECOND CLAIM

### Violations of Section 17(a) of the Securities Act

51. Plaintiff SEC realleges and incorporates by reference paragraphs 1 through 47 of this Complaint as if set forth verbatim.

52. Each Defendant directly or indirectly, singly or in concert, in the offer and sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce, or by use of the mails, have (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact, or omissions of material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, practices, or courses of business which operate or would operate as a fraud or deceit upon the purchasers of securities. With respect to violations of Sections 17(a)(2) and (3) of the Securities

Act, the Defendants acted knowingly, recklessly, unreasonably, or negligently. With respect to violations of Section 17(a)(1) of the Securities Act, the Defendants acted knowingly or recklessly.

53. By reason of the foregoing, the Defendants have violated and, unless enjoined, will again violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## REQUEST FOR RELIEF

The SEC respectfully requests that this Court:

### I.

Preliminarily and permanently enjoin each Defendant from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)], and Rule 10b-5 under the Exchange Act [17 C.F.R. §§ 240.10b-5].

### II.

Enter an order immediately freezing the assets of Defendant 4D Circle and directing that all financial or depository institutions comply with the Court's Order.

### III.

Order that Defendants be restrained and enjoined from destroying, removing, mutilating, altering, concealing, or disposing of, in any manner, any of their books and records or documents relating to the matters set forth in the Complaint, or the books and records and such documents of any entities under their control, until further order of the Court.

### IV.

Order the appointment of a receiver for Defendant 4D Circle, for the benefit of investors, to marshal, conserve, protect, and hold funds and assets obtained by 4D Circle and its agents, co-conspirators, and others involved in this scheme, wherever such assets may be found.

V.

Order each Defendant to disgorge an amount equal to the funds and benefits obtained illegally, or to which that Defendant otherwise has no legitimate claim, as a result of the violations alleged, plus prejudgment interest on that amount.

VI.

Order each Defendant to pay a civil penalty in an amount determined by the Court pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

VII.

Order such other relief as this Court may deem just and proper.

Respectfully submitted,

April 13, 2017

CHRIS DAVIS
Texas Bar No. 24050483
DAVID B. REECE
Texas Bar No. 24002810
United States Securities and Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit 18
Fort Worth, Texas 76102
Telephone: (817) 900-2638
FAX: (817) 978-4927
E-mail: davisca@sec.gov

JS 44 (Rev. 08/16) - TXND (Rev. 12/16) CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**
SECURITIES AND EXCHANGE COMMISSION

**DEFENDANTS**
4D CIRCLE LLC a/k/a ENOETICS, MANTFORD C. HAWKINS, and DAVID E. BELL

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Tarrant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- ☒ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*   Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | | | ☐ 840 Trademark | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☒ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):*
15 U.S.C. § 77q(a), 15 U.S.C. §§ 78j(b), and 17 C.F.R. §§ 240.10b-5,
Brief description of cause:
Violations of Federal Securities Laws.

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

**VIII. RELATED CASE(S) IF ANY** *(See instructions):*
JUDGE                                   DOCKET NUMBER

DATE 4/13/17
SIGNATURE OF ATTORNEY OF RECORD
Chris Davis

**FOR OFFICE USE ONLY**

RECEIPT #            AMOUNT            APPLYING IFP            JUDGE            MAG. JUDGE